**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**JEAN HARVEY,**

                                 **Plaintiff,**

      **v.**                                       **5:05-CV-1094**
                                                           **(NAM)**

**MICHAEL J. ASTRUE\*,**
**COMMISSIONER OF SOCIAL SECURITY,**

                                 **Defendant.**
_____

**APPEARANCES:**                        **OF COUNSEL:**

Olinsky & Shurtliff               Jaya Shurtliff, Esq.
P.O. Box 2068
186 West First Street
Oswego, New York 13126
Attorney for Plaintiff

Glenn T. Suddaby                William H. Pease, Esq.
United States Attorney for
the Northern District of New York
P.O. Box 7198-
100 South Clinton Street
Syracuse, New York 13261-7198
and
Office of General Counsel           Barbara L. Spivak, Esq.
Social Security Administration      Stephen P. Conte, Esq.
26 Federal Plaza
New York, New York 10278
Attorneys for Defendant

      \*\* On February 12, 2007, Michael J. Astrue was sworn in as Commissioner of the Social
Security Administration.  Pursuant to Federal Rule of Civil Procedure 25(d)(1), he is
automatically substituted for former Commissioner Joanne B. Barnhart as the defendant in
this action.

**NORMAN A. MORDUE, Chief U.S. District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.       INTRODUCTION

Plaintiff Jean Harvey brings the above-captioned action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) of the Social Security Act, seeking review of the Commissioner of Social Security's decision to deny her application for disability insurance benefits ("DIB").  Presently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

## II.      BACKGROUND

Plaintiff was born on December 1, 1954, and was 49 years old at the time of the administrative hearing on May 13, 2004. (Administrative Transcript at p. 29, 57).[1]  Plaintiff is single and has no natural children.  (T. 75, 237).  Plaintiff is the guardian of an 8 year old boy and resides with him in a mobile home.  (T. 75).  At the time of the administrative hearing, plaintiff was enrolled in her "second semester of classes at Cortland".[2] (T. 294).  Plaintiff previously completed two years of college and obtained a degree in respiratory therapy in 1998.  (T. 67, 294).   From March 2001 until March 2002, plaintiff was employed as a child care counselor by KidsPeace National Center for Kids in Crisis.[3] (T. 63, 294).   Plaintiff worked the night shift (11 p.m. until 7 a.m.) with responsibilities that included conducting bed checks, household work, restraining combative children and assisting in emergency situations. (T. 91).  For the last 6 months of her employment with KidsPeace, plaintiff worked "light duty". (T. 63).  While working

---

[1]  Portions of the administrative transcript, Dkt. No. 7, will be cited herein as "(T__)."

[2]  The record does not contain specific information regarding what institution plaintiff was attending other than "Cortland".

[3]  KidsPeace is described by plaintiff as a residential care facility for children (ages 8 to 21) with emotional problems including sex offenders or truants. (T. 91, 294).

"light duty", plaintiff refrained from lifting or carrying anything and from restraining the children. (T. 63).   From January 1999 until March 2001, plaintiff was employed as a respiratory therapist. (T. 63, 296).   Plaintiff's responsibilities included assisting in emergency situations, performing CPR, hooking up ventilators and lifting patients. (T. 295).   From 1978 until 1996, plaintiff was employed by TRW, a company that manufactured automobile parts. (T. 296).   Plaintiff did "assembly work" that included heavy lifting.  (T. 64, 296).   Plaintiff claims she is disabled due to injuries to her left shoulder, arm, hand, and neck. (T. 29).   Further, plaintiff claims that she suffers from arthritic joints, high blood pressure and diabetes.  (T. 29).   The last day that she worked in any capacity was March 15, 2002.[4] (T. 294).

**A**.     **Plaintiff's Medical Treatment**

A review of the record reveals that plaintiff was treated for her alleged disabling conditions by Kevin Goff, D.C., Dr. John Fatti, Dr. Martin Schaeffer, Dr. Stephen Bogosian, FNP (Family Nurse Practitioner) C. Saxton, and Dr. James Kowalczyk.

Kevin Goff, D.C.

On December 12, 1994, plaintiff began receiving chiropractic treatments from Kevin Goff, D.C. for neck and back pain.  (T. 124-171).   Plaintiff advised Goff that she was involved in a motor vehicle accident that day.  (T. 170).   Goff provided chiropractic treatment "as needed" until October 10, 1998. (T. 124-171).   Plaintiff next sought treatment on August 31, 1999 after another motor vehicle accident. (T. 115).   Goff noted that plaintiff complained of pain in her neck, left shoulder and back.  (T. 115).   Goff diagnosed plaintiff with a cervical strain/sprain and

---

[4] There are inconsistencies in the record regarding plaintiff's last day of employment.  There is evidence indicating that her last day was March 15, 2002 (T. 294) while other records indicate the date was August 2002. (T. 217).

treated her for one month until October 1999. (T. 114).  On May 3, 2001, plaintiff sought treatment with Kevin Goff complaining of pain in her neck, left shoulder, rib and left knee after a third motor vehicle accident.[5] (T. 110).  Goff diagnosed plaintiff with a cervical and lumbar sprain/strain.  Goff noted that he provided chiropractic treatment to plaintiff "once a week" until January 22, 2002. (T. 94 - 102).   Plaintiff returned to Goff in July 2002 and received treatment twice a month until March 2004.[6] (T. 266-269).

John F. Fatti, M.D.

On March 25, 2002, plaintiff was examined by John F. Fatti, M.D., an orthopedist affiliated with Syracuse Orthopedic Specialists (T. 215).  Dr. Fatti indicated that plaintiff complained of pain and weakness in her left hand. (T. 215).  Dr. Fatti noted that plaintiff underwent nerve conduction studies administered by Dr. Schaeffer in September 2001.[7]  (T. 215).  Dr. Fatti noted that plaintiff had swelling in her left hand with normal range of motion but decreased sensation. (T. 216).  Dr. Fatti diagnosed plaintiff with significant carpal tunnel syndrome and recommended a release.[8] (T. 216).

On June 3, 2002, plaintiff had her first post-operative visit with Dr. Fatti. (T. 214).  Dr. Fatti noted that plaintiff's examination was "normal".  (T. 214).  Dr. Fatti fitted plaintiff for a wrist brace and suggested that she wear the device for two weeks. (T. 214).  Dr. Fatti commented

[5] On the same day, May 3, 2001, plaintiff went to the emergency room of Auburn Memorial Hospital claiming she had been in a motor vehicle accident. (T. 205).  Plaintiff told the triage nurse that she "hit a cow at 55 mph".  (T. 205).  Plaintiff was diagnosed with multiple contusions. (T. 205).

[6] Goff's records for this period of time consist of handwritten notations that are illegible.  (T. 266-269).

[7] The record does not contain any reports from Dr. Schaeffer in 2001 or any reports of any nerve conduction studies performed in 2001.  Dr. Schaeffer's first record is dated September 23, 2002. (T. 211).

[8] The record does not contain any operative report or any evidence indicating the date that the release was performed, however Dr. Schaeffer's subsequent records indicate that it was performed in April 2002.

4

that plaintiff was out of work at that time.  (T. 214).  On July 29, 2002, plaintiff returned to Dr. Fatti complaining of weakness, tingling and pain. (T. 213).  Plaintiff advised Dr. Fatti that she could not do her job because of her of her inability to grip.  (T. 213).  Upon examination, Dr. Fatti noted some swelling of her left hand, decreased extension, and a mild decrease of her range of motion. (T. 213).  Dr. Fatti found that plaintiff's grip strength was 30% of normal without atrophy. (T. 213).  Dr. Fatti prescribed physical therapy and remarked that plaintiff "cannot do her job". (T. 213).

On November 1, 2002, plaintiff returned to Dr. Fatti for a "management visit". (T. 207). Dr. Fatti noted that plaintiff complained of weakness but reported improvement with tingling, pain and numbness. (T. 207).  Dr. Fatti examined plaintiff and noted tenderness, a decreased extension and decreased sensation. (T. 207).  Dr. Fatti restricted plaintiff's activity and stated that she could not do any heavy or repetitive lifting with the left upper extremity. (T. 207).  He further opined that this restriction was likely permanent.  (T. 207).

On January 13, 2003, plaintiff returned to Dr. Fatti and stated that she discontinued physical therapy as the insurance company would no longer pay. (T. 253).  Plaintiff advised Dr. Fatti that physical therapy helped her and since she stopped receiving treatments, her numbness and pain were more frequent and worse. (T. 253).   Dr. Fatti noted that her condition was "the same".  (T. 253).  Dr. Fatti requested nerve conduction studies to rule out any recurrent compression. (T. 253).

On March 24, 2003, plaintiff had her last visit with Dr. Fatti.  (T. 246).  Dr. Fatti noted that plaintiff's nerve studies "showed marked improvement".  (T. 246).  Plaintiff advised Dr. Fatti that her carpal tunnel was "much improved" but that she had numbness and tingling from the

shoulder and elbow. (T. 246).  Dr. Fatti noted that despite the normal nerve studies, plaintiff had

50% range of motion in her neck.  As such, Dr. Fatti noted that plaintiff "probably has some

cervical radiculitis".  (T. 246).  Dr. Fatti remarked that since plaintiff had "a normal MRI of the

shoulder", an MRI of plaintiff's cervical spine was necessary to determine whether the pain

emanated from her cervical spine.[9] (T. 246).

> Martin A. Schaeffer, M.D.

On September 23, 2002, plaintiff treated with Martin A. Schaeffer, M.D., an orthopedist

affiliated with Syracuse Orthopedist Specialists. (T. 211).  Dr. Schaeffer noted that plaintiff

complained of pain in her left shoulder but advised that "special  therapy" had helped. (T. 211).

Dr. Schaeffer indicated that plaintiff was taking Celebrex and had an appointment scheduled with

VESID (Vocational and Educational Services for Individuals with Disabilities) in October 2002.[10]

(T. 211).   Upon examination, Dr. Schaeffer noted that plaintiff was overweight and not in

distress.  (T. 211).  Dr. Schaeffer commented that plaintiff had a decrease in shoulder strength but

that her left shoulder motion was "significantly improved" despite continued complaints of pain.

(T. 211).  Dr. Schaeffer injected plaintiff's left shoulder with Depo-Medrol.[11]  (T. 211).  Dr.

Schaeffer found that after the injection, plaintiff showed a moderate decrease in pain and an

increase in her range of motion. (T. 211).  Dr. Schaeffer prescribed physical therapy and Vioxx.

(T. 211).  Dr. Schaeffer cleared plaintiff for "no lifting of weights greater than 10 pounds using

the left upper extremity with no repetitious-type activities".  (T. 211).

---

[9] The record is devoid of any reports of any MRI studies.

[10] The record does not contain any reports from VESID.

[11] Depo-Medrol is soft-tissue injection used as an anti-inflammatory and immunosuppressant in a wide variety of disorders. *Dorland's Illustrated Medical Dictionary*, (31st ed. 2007).

On October 28, 2002, plaintiff returned to Dr. Schaeffer complaining of left shoulder and upper extremity pain. (T. 209).  Plaintiff advised Dr. Schaeffer that she was "definitely better" after the injection. (T. 209).  Dr. Schaeffer noted that plaintiff was not receiving physical therapy. (T. 209).   Dr. Schaeffer indicated that muscle testing revealed significantly improved left shoulder strength with a significant decrease in pain. (T. 209).  Dr. Schaeffer also remarked that plaintiff had tenderness laterally with negative impingement and mobility, transfer, ambulation and station were all normal.  (T. 209).  Dr. Schaeffer diagnosed plaintiff with left upper extremity and shoulder pain with degenerative disease. (T. 209).  Dr. Schaeffer opined that plaintiff was clear for "no weights greater than 20 pounds with no repetitious-type activities, full time work". (T. 209).  Dr. Schaeffer suggested home exercises and prescribed Mobic.[12] (T. 209).

On December 30, 2002, plaintiff had another visit with Dr. Schaeffer.  (T. 255).  Dr. Schaeffer noted that plaintiff's "follow up with Dr. Fatti was stable". (T. 255).  Plaintiff advised Dr. Schaeffer that she was no longer taking Mobic due to financial difficulties.  (T. 255).  Dr. Schaeffer's diagnosis of plaintiff was unchanged from October 2002.  (T. 255).  Dr. Schaeffer provided plaintiff with samples of Bextra[13] and opined that plaintiff was still able to work under the same restrictions. (T. 255).

On January 20, 2003 and February 3, 2003, plaintiff treated with Dr. Schaeffer presenting the same complaints of pain.  (T. 251).  Dr. Schaeffer noted an "overall improvement" and advised plaintiff to continue taking Bextra. (T. 251).  Dr. Schaeffer suggested a "pain patch" but

---

[12] Mobic is a nonsteroidal anti-inflammatory drug used in the treatment of osteoarthritis; administered orally.  *Dorland's*, at .

[13] Bextra is an anti-inflammatory used for symptomatic treatment of osteoarthritis or rheumatoid arthritis. *Dorland's* at 215, 2048.

plaintiff expressed "financial concerns" with regard to prescription medication. (T. 251).  Dr. Schaeffer noted that plaintiff was cleared for restrictive work with no weights greater than 20 pounds and no repetitive-type activities. (T. 251).  Dr. Schaeffer's Electrodiagnostic Report is part of the February 3, 2003 record. (T. 248).  Dr. Schaeffer noted mild left median nerve compression much improved from prior testing on September 10, 2001.[14] (T. 248).  Dr. Schaeffer noted that the mild median nerve compression represented a residual effect from the successful release. (T. 248).  Dr. Schaeffer concluded that there was no additional evidence suggestive of nerve compression. (T. 248)

On May 19, 2003, plaintiff treated with Dr. Schaeffer complaining of pain and numbness in her neck and left upper extremity. (T. 244).  Dr. Schaeffer noted that an MRI study was available for review.[15] (T. 244).  Upon examination, Dr. Schaeffer noted muscle testing was grossly intact, but with decreased left shoulder strength. (T. 244).  Dr. Schaeffer found that plaintiff exhibited tenderness in neck region with decreased range of motion secondary to complaints of pain and full motion intact with complaints of pain.  (T. 244).  Plaintiff advised Dr. Schaeffer that she was scheduled to start school.  (T. 244).  Dr. Schaeffer opined that plaintiff was under the same restrictions and prescribed Bextra and Ultracet.[16] . (T. 244).  Dr. Schaeffer noted that plaintiff was cleared for no weights greater than 20 pounds. (T. 244).

Stephen Bogosian, M.D.

On June 6, 2003, plaintiff was examined by Stephen Bogosian, M.D., an orthopedist

---

[14] The record does not contain any electrodiagnostic report other than the February 3, 2003 record.

[15] The record does not contain any reports of any MRI studies.

[16] Ultracet is an opioid analgesic used for the treatment of moderate to moderately severe pain following surgical procedures and oral surgery; administered orally. *Dorland's* at 1755.

affiliated with Syracuse Orthopedic Specialist. (T. 240).  The plaintiff had one visit with Dr.

Bogosian after Dr. Schaeffer left the practice. (T. 240).  Dr. Bogosian noted that plaintiff

complained of left shoulder, arm and cervical pain. (T. 240).  Plaintiff advised that she was taking

Bextra and was scheduled to be seen at pain clinic.  (T. 240-241).  Dr. Bogosian commented that

a recent MRI of plaintiff's cervical spine revealed stenosis at C4-5 and C6-7. (T. 241).   Upon

examination, Dr. Bogosian noted tenderness in her shoulder, no effusion or crepitance, and no

deformity. (T. 241).  Dr. Bogosian found that plaintiff exhibited positive impingement in her

shoulder with a mild range of motion loss, but no atrophy of upper extremity. (T. 241).  Dr.

Bogosian stated that plaintiff had a normal range of motion of her neck with no signs of

instability in spine. (T. 241).  Dr. Bogosian diagnosed plaintiff with pain in her neck,

impingement syndrome in her shoulder, and spinal stenosis in the cervical spine. (T. 242).  Dr.

Bogosian suggested that plaintiff treat with Dr. Zogby and suggested that she consider injections

for her pain.[17]  (T. 242).

Community Medical Center

On March 10, 2004, plaintiff was treated by FNP C. Saxton.  FNP Saxton noted that

plaintiff complained of pain all over which was "getting more severe".  (T. 228).  FNP Saxton

diagnosed plaintiff with low back pain, right knee pain and shoulder pain. (T. 228).   FNP Saxton

prescribed physical therapy and Darvocet.[18]  (T. 228).

Diagnostic Imaging Center

On March 11, 2004, plaintiff had x-rays taken of her right shoulder, right knee and lumbar

---

[17] The record does not contain any reports of any treatment by Dr. Zogby.

[18] Darvocet is an anti-inflammatory.  *Dorland's Illustrated Medical Dictionary,* 479 (31st ed. 2007).

spine.  (T. 261-265).  The x-rays were reviewed by Dr. John H. Van Slyke at Diagnostic Imaging

Center. (T. 261-265).  Dr. Van Slyke concluded that plaintiff's right shoulder and right knee x-

rays revealed osteoarthritis. (T. 261, 262).  Dr. Van Slyke noted that the x-ray of plaintiff's

lumbosacral spine revealed degenerative disc disease with mild scoliosis. (T. 263)

Physical Therapy

On March 17, 2004, plaintiff received an initial evaluation at the Physical Therapy

Department of Auburn Memorial Hospital.  (T. 272).  The therapist recommended that plaintiff

receive treatments twice a week for four weeks for her chronic problem. (T. 272).  The notes

indicate that plaintiff received two additional treatments and was discharged at the end of  March

2004. (T. 272).

Medical Pain Management of CNY

On March 24, 2004, plaintiff had her last treatment with Dr. Schaeffer, who had become

affiliated with Medical Pain Management of CNY.[19]  (T. 260).   Dr. Schaeffer noted that plaintiff

complained of neck and left upper extremity pain. (T. 260).  Dr. Schaeffer diagnosed plaintiff

with degenerative disease and cervical stenosis.  (T. 260).  Dr. Schaeffer scheduled plaintiff for

injections with his partner, Dr. James Kowalcyk, an anesthesiologist. (T. 260).  On April 7, 2004,

Dr. Kowalczyk conducted a cervical epidurography after providing plaintiff with a cervical

steroid injection.[20]  (T. 257).

Medical Source Statement

_____

[19] Dr. Schaeffer's records from the March 2004 visit describe the treatment as a "follow up visit" however,
there are no prior records from Medical Pain Management in the record.

[20] Dr. Kowalczyk's notes indicate that plaintiff returned after a "long hiatus" and that she was previously
seen in October 2003. The record does not contain reports or records of that visit or any prior treatment by Dr.
Kowalczyk.

On May 12, 2004, Dr. Schaeffer completed a Medical Source Statement. (T. 285). Dr. Schaeffer reported that plaintiff claimed she could walk one to two city blocks. (T. 286). Dr. Schaeffer opined that plaintiff could sit and/or stand for 1 hour before needing to sit or walk. (T. 287). Dr. Schaeffer stated that plaintiff was able to sit and/or stand for 4 hours in an 8 hour day. (T. 287). Dr. Schaeffer opined that during an 8 hour workday, plaintiff must be permitted to walk for a total of 45 to 60 minutes, for 10 minutes each time. (T. 287). Dr. Schaeffer further stated that plaintiff would need to take frequent, unscheduled 10 minute breaks during an 8 hour workday. (T. 287). Dr. Schaeffer noted that plaintiff could "rarely lift less than 10 pounds" with her right arm and could rarely twist, crouch, climb. (T. 287). Dr. Schaeffer noted that she could occasionally stoop. (T. 288). According to Dr. Schaeffer, plaintiff could never use her left arm. (T. 288). Dr. Schaeffer estimated that plaintiff would need to be absent from work more than four days a month due to her impairments. (T. 288).

**B.      Consultative Examinations**

Donald Cally, M.D.

On August 6, 2002, plaintiff was examined by Donald Cally, M.D., an orthopedist, at the request of Allstate Insurance Company. (T. 172). Dr. Cally noted that plaintiff complained of pain with constant aching and discomfort of varying degrees in her neck and left upper extremity including her shoulder. (T. 172). Dr. Cally noted that plaintiff was a counselor at KidsPeace and was out of work for 5 months following the accident. (T. 172). Plaintiff advised Dr. Cally that she later returned for 6 months of light duty (not restraining combative clients) before being terminated. (T. 172). Upon examination, Dr. Cally noted that plaintiff had tenderness on her left side and a full range of motion of her cervical spine. (T. 173). Dr. Cally stated that a neurological

examination of both upper extremities was normal.  (T. 173).  Dr. Cally indicated that there was

no atrophy of plaintiff's left shoulder, negative impingement signs and a limited range of motion

in some areas and normal external rotation. (T. 173).  Dr. Cally diagnosed plaintiff with non-

specific neck and left trapezious pain due to degenerative disease, epicondylitis of left elbow, and

hypothenar muscular pain.[21] (T. 174).  Dr. Cally opined that plaintiff could work at her normal job

at KidsPeace if she did not restrain patients. (T. 174).  Further, Dr. Cally stated that plaintiff could

work at a job that did not require repetitive action with her left upper extremity.  (T. 175).  Dr.

Cally noted plaintiff had no restrictions for the right upper extremity. (T. 175).

    Kalyani Ganesh, M.D.

    On January 21, 2003, plaintiff was examined by Kalyani Ganesh, M.D., an orthopedist, at

the request of the agency. (T. 217).  Dr. Ganesh noted that plaintiff complained of pain in her left

shoulder, elbow, hand, neck, back, hip and knee.  (T. 217).  Dr. Ganesh indicated that plaintiff last

worked in August 2002. (T. 217).  Upon examination, Dr. Ganesh noted that plaintiff was not in

acute distress, she was obese, walked with a normal gait and performed a normal heel/toe walk.

(T. 218).  Dr. Ganesh found that plaintiff's squat was "75%", she had a normal stance and needed

no assistance getting on and off the examining table. (T. 218).  Dr. Ganesh remarked that

plaintiff's cervical spine flexion was full but her extension was limited.  (T. 219).  Dr. Ganesh

found that plaintiff exhibited a full range of motion in her shoulders and straight leg raising was

negative bilaterally. (T. 219).  Dr. Ganesh diagnosed plaintiff with chronic joint pain,

hypertension and diabetes. (T. 219).  Dr. Ganesh provided a Medical Source Statement wherein

---

    [21] Epicondylitis is inflammation of the epicondyle or of the tissues adjoining the epicondyle of the humerus.
*Dorland's* at 637.   Hypothenar muscle pain involves the intrinsic muscles of the little finger; flexing, abducting, and
opposing. *Id*. at  919.

he opined that plaintiff had no physical limitation to sitting, standing, walking, climbing or bending.  (T. 219).   According to Dr. Ganesh, plaintiff had a mild degree of limitation lifting, carrying, pushing pulling and overhead. (T. 219).

> Physical Residual Functional Capacity Assessment - M.L. Parr

The record also contains a Physical Residual Functional Capacity ("RFC") Assessment dated January 30, 2003 completed by M.L. Parr, a disability analyst. (T. 221-226).  Parr concluded that plaintiff could occasionally lift and carry 20 pounds; frequently lift and carry 10 pounds; stand and/or walk for 6 hours in an 8 hour workday; sit for 6 hours in an 8 hour workday. (T. 221-226).   Parr found that plaintiff had an unlimited ability to push and pull.  (T. 221-226). Parr noted that the record contained a medical source statement from a treating source and Parr opined that his findings were "not significantly different" from the treating source's conclusions regarding plaintiff's limitations and restrictions.  (T. 225).

## III.    PROCEDURAL HISTORY

Plaintiff filed an application for Social Security disability insurance benefits ("DIB") on December 4, 2002.  (T. 57).  The application was denied on February 6, 2003.  (T. 51).  Plaintiff requested a hearing before an Administrative Law Judge ("ALJ") which was held on May 13, 2004. (T. 28).  On July 28, 2004, ALJ Craig DeBernardis issued a decision denying plaintiff's claim for disability benefits.  (T. 28-36).  The Appeals Council denied plaintiff's request for review on August 12, 2005, making the ALJ's decision the final determination of the Commissioner. (T. 3).  This action followed.

**IV.    ADMINISTRATIVE LAW JUDGE'S DECISION**

The Social Security Act (the "Act") authorizes payment of disability insurance benefits to individuals with "disabilities."  The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A). There is a five-step analysis for evaluating disability claims:

> "In essence, if the Commissioner determines (1) that the claimant is not working, (2) that he has a 'severe impairment,' (3) that the impairment is not one [listed in Appendix 1 of the regulations] that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in his prior type of work, the Commissioner must find him disabled if (5) there is not another type of work the claimant can do." The claimant bears the burden of proof on the first four steps, while the Social Security Administration bears the burden on the last step.

*Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003) (quoting *Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir. 2002)); *Shaw v. Chater*, 221 F.3d 126, 132 (2d Cir. 2000) (internal citations omitted).

In this case, the ALJ found at step one that plaintiff has not engaged in gainful activity since the filing date of her application. (T. 29).  At step two, the ALJ concluded that plaintiff suffered from cervical and lumbar spine disorders, sequelae of left carpal tunnel release surgery, left shoulder impingement, and osteoarthritis of the right shoulder and right knee which qualified as a "severe impairments" within the meaning of the Social Security Regulations (the "Regulations").  (T. 29).  At the third step of the analysis, the ALJ determined that plaintiff's impairments did not meet or equal the severity of any impairment listed in Appendix 1 of the Regulations.  (T. 30).  At the fourth step, the ALJ found that plaintiff had the following residual

functional capacity ("RFC"):

> to lift and/or carry twenty pounds occasionally and ten pounds frequently; stand and/or walk for a total of six hours in an eight-hour workday; sit for a total of six hours in an eight-hour workday; push and/or pull occasionally with her upper and lower extremities; climb stairs and ramps occasionally, but never to climb ladders, ropes and scaffolds; balance, stoop and kneel occasionally; but never to crouch and craw; reach occasionally, but not overhead/; and to handle and finger occasionally. (T. 31).

Accordingly, the ALJ found that plaintiff could perform a range of light level work but concluded that she was unable to perform all of her past relevant work. (T. 36).  Since plaintiff claimed that she suffered from exertional and non-exertional limitations, the ALJ obtained the testimony of a vocational expert to determine whether there were jobs plaintiff could perform. Based upon the vocational expert's testimony, the ALJ concluded at step five, that there are a significant number of unskilled, light occupations in the regional and national economy that plaintiff could perform, such as work as a counter-clerk, tanning salon attendant and cleaner. (T. 35).  Therefore, the ALJ concluded that plaintiff was not under a disability as defined by the Social Security Act.  (T. 35).

## V.    DISCUSSION

A Commissioner's determination that a claimant is not disabled will be set aside when the factual findings are not supported by "substantial evidence."  42 U.S.C. § 405(g); *see also Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000).  Substantial evidence has been interpreted to mean "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*  The Court may also set aside the Commissioner's decision when it is based upon legal error. *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999).

Plaintiff argues that: (1) the ALJ failed to follow the treating physician rule and afford the

proper weight to Dr. Schaeffer's opinions; (2) the ALJ erred in evaluating plaintiff's credibility; (3) the RFC determination by the ALJ is not supported by substantial evidence; and (4) the ALJ improperly relied upon the testimony of the vocational expert and thus, the Commissioner did not sustain his burden of proof at the fifth step of the sequential evaluation process.

**A.      Treating Physician Rule**

Plaintiff argues that the ALJ improperly rejected Dr. Schaeffer's opinions expressed in his Medical Source Statement.  Specifically, plaintiff claims that the ALJ improperly rejected Dr. Schaeffer's opinions solely on the basis that his opinion conflicted with his clinical findings. (Dkt. No. 8, pp. 14-15).  Plaintiff asserts that if the ALJ believed there was a conflict in the medical evidence, the ALJ had an obligation to contact Dr. Schaeffer. (Dkt. No. 8, p. 14).  The Commissioner contends that the ALJ had no obligation to further develop the record as there was sufficient medical evidence in the record to allow the ALJ to determine whether or not plaintiff was disabled.  (Dkt. No.11, p. 12).

By statute, the ALJ is required to develop the complete medical history for at least a twelve-month period prior to the date of application.  *See* 42 U.S.C. § 423(d)(5)(B); 20 C.F.R. § 416.912(d)(2).  The ALJ does not need to attempt to obtain every extant record of the claimant's doctor visits when the information on the record is otherwise sufficient to make a determination, and need not request more detailed information from the treating physician if the physician's report is a sufficient basis on which to conclude that the claimant is not disabled.  *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999)

An ALJ need not seek further explanation from treating physicians each time there is an inconsistency in medical opinions.  *Hogue v. Barnhart*,  2005 WL 1036336, at *14 (S.D.N.Y.

2005) (holding that the ALJ did not err in failing to request further information as the ALJ did not reject the treating physician's opinion for failure to explain his reasoning; rather, he rejected it based on the medical opinion of other physicians); *see also Peterson v. Barnhart*, 219 F.Supp.2d 491, 494 (S.D.N.Y. 2002) (holding that no inconsistencies exist as plaintiff's medical reports are complete and uncontradicted by similar reports during the disputed period).

In *Rebull v. Massanari*, 240 F.Supp.2d 265, 272 (S.D.N.Y. 2002), the court rejected the plaintiff's claim that the ALJ should have contacted the treating physician to explain apparent inconsistencies between her opinion in a Medical Source Statement and her conclusions and other information contained in her treatment notes.  The court found that the discord between the treating physician's stated opinion and the evidence is more properly construed as a credibility issue rather than an issue of the completeness of the record.  *Rebull,* 240 F.Supp.2d at 273. Specifically, the court held:

> This aspect of the fact-finding function, a credibility determination, in essence, would be rendered nugatory if, whenever a treating physician's stated opinion is found to be unsupported by the record, the ALJ were required to summon that physician to conform his opinion to the evidence. Such a standard, in turn, would invite additional critique by the Commissioner in opposition and conceivably demand another recall of the treating physician, ad infinitum. Reasonable discretion in the assessment of the adequacy and completeness of the administrative record circumscribes this potential vicious cycle.

*Rebull*, 240 F.Supp.2d at 273.

Under the regulations, a treating physician's opinion is entitled to "controlling weight" when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with substantial evidence in [the] case record."  20 C.F.R. § 404.1527(d)(2) (2001); *see also Rosa v. Callahan*, 168 F.3d 72, 78-79 (2d Cir. 1999); *Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir. 1993); *see also Filoramo v. Apfel*, 1999 WL 1011942, at *7

17

(E.D.N.Y. 1999) (holding that the ALJ properly discounted the assessment of a treating physician as it was inconsistent with opinions of other treating and consulting physicians). When an ALJ refuses to assign a treating physician's opinion controlling weight, he must consider a number of factors to determine the appropriate weight to assign, including:

> (i) the frequency of the examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion.

20 C.F.R. 404.1527(d)(2).  Additionally, the regulations direct the Commissioner to "give good reasons in [his] notice of determination or decision for the weight [he] give[s] [claimant's] treating source's opinion".  *Id*.; accord 20 C.F.R. 416.927(d)(2).

In this case, plaintiff filed her application for benefits on December 24, 2002. (T. 57).  The record contains reports from December 1994 through April 2004. (T. 94-284).  This is clearly beyond both ends of the twelve-month statutory requirement.  The ALJ discussed the records and reports of all treating physicians, objective testing and consultative examiners in the decision. (T. 31-34).  The ALJ concluded that Dr. Schaeffer's May 2004 opinion was not "worthy of much weight".  (T. 33).  Specifically, the ALJ concluded that Dr. Schaeffer's assessments were inconsistent with the Dr. Schaeffer's own medical reports as they are in "stunning contradiction of his previously expressed views". (T. 33).   Further, the ALJ found that Dr. Schaeffer's opinions were contradicted by the "consensus of medical opinions in this case".  (T. 33).  After reviewing the administrative transcript, the Court finds that the record adequately and completely reflected plaintiff's medical history.  Accordingly, the ALJ had no obligation to contact Dr. Schaeffer to supplement the existing record.  Further, the ALJ afforded the appropriate weight to Dr.

Schaeffer's opinions in the Medical Source Statement.

Dr. Schaeffer treated plaintiff seven times from 2002 through 2004.  At the first examination on September 23, 2002, Dr. Schaeffer noted that plaintiff's shoulder motion was "significantly improved" and cleared plaintiff for "no weights greater than 10 pounds using the left upper extremity with no repetitious-type activity". (T. 211).  One month later, Dr. Schaeffer noted plaintiff had a significant decrease in pain and altered his opinion stating that plaintiff was cleared for "no weights greater than 20 pounds with no repetitious-type activities, full time work".  (T. 209).   Dr. Schaeffer repeated this opinion in December 2002, January 2003, February 2003 and May 2003. (T. 244, 249, 251, 255).  In March 2004, Dr. Schaeffer did not comment on the amount of lifting plaintiff could sustain, rather, he stated that plaintiff was "cleared for course work, which she has been actively taking". (T. 260).  Dr. Schaeffer completed the Medical Source Statement two months after plaintiff's last examination.[22] (T. 285).  In the statement, Dr. Schaeffer opined that the plaintiff could sit and stand for 4 hours in an 8 hour day, could never use her left arm, and could "rarely lift less than 10 pounds" with her right arm.  (T. 287).  Further, Dr. Schaeffer stated that plaintiff could rarely twist, crouch, or climb. (T. 287).   A thorough review of the transcript reveals that Dr. Schaeffer's opinions in the Medical Source Statement are in conflict with all of his prior assessments of plaintiff's complaints of pain, results of her examinations and testing, and his prior opinions regarding her activities and restrictions.

The ALJ further noted that Dr. Schaeffer's opinions were unsupported by the substantial medical evidence in the record.   Indeed, it was Dr. Schaeffer who analyzed the electrodiagnostic testing performed on February 3, 2003 and found that the plaintiff's condition was "much

---

[22] There is no record that Dr. Schaeffer examined plaintiff on May 2, 2004 prior to completing the statement.

improved" from prior testing. (T. 248).  Further, Dr. Schaeffer stated that there was "no additional evidence suggestive of peripheral nerve compression".  (T. 248).   Moreover, Drs. Schaeffer and Fatti reviewed the MRI study of plaintiff's shoulder and found it to be "normal".  (T. 244, 246). Dr. Bogosian found that plaintiff had a normal range of motion in her neck with no signs of instability in her spine. (T. 241).  Dr. Cally opined that plaintiff could work her normal job at KidsPeace without restraining children. (T. 175).  Dr. Cally also found that plaintiff could work at any job that did not require repetitive action with her left upper extremity. (T. 175).  Dr. Ganesh provided a similar assessment and concluded that plaintiff had a mild degree of limitation lifting, carrying, pushing and pulling overhead. (T. 219).  After reviewing the record of medical evidence, the Court finds substantial evidence exists to support the ALJ's conclusions and the weight afforded to Dr. Schaeffer's opinions.

Accordingly, the Court finds that the ALJ properly considered the regulations in refusing to give controlling weight to Dr. Schaeffer's May 2004 opinion regarding the plaintiff's functional limitations.  Further, substantial evidence exists to support the ALJ's conclusions without the need for further evidence or clarification from the treating physician.

**B.    Credibility**

Plaintiff argues that the ALJ applied an incorrect legal standard and erroneously determined that plaintiff's statements regarding her impairments were not fully credible. (Dkt. No. 8, p. 16).   Plaintiff alleges that the ALJ failed to comply with the requirements of Social Security Ruling ("SSR") 96-7p.  Further, plaintiff claims that the ALJ failed to consider her "good work record" and improperly relied upon her inability to pay for prescription medications as a factor in assessing her credibility .  (Dkt. No. 8, p. 16).  Defendant contends that the ALJ

followed the Commissioner's regulations in evaluating plaintiff's symptoms and pain. (Dkt. No. 11, p. 13).

It is well settled that "a claimant's subjective evidence of pain is entitled to great weight where . . . it is supported by objective medical evidence". *Simmons v. U.S. R.R. Retirement Bd.*, 982 F.2d 49, 56 (2d Cir. 1992) (citations omitted). "Objective medical evidence is evidence obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, such as evidence of reduced joint motion, muscle spasm, sensory deficit or motor disruption." *Casino-Ortiz v. Astrue*, 2007 WL 2745704, at *11, n. 21 (S.D.N.Y. 2007) (citing 20 C.F.R. § 404.1529(c)(2)) . The ALJ retains discretion to assess the credibility of a claimant's testimony regarding disabling pain and "to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of the pain alleged by the claimant." *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979); *Snell v. Apfel*, 177 F.3d 128, 135 (2d Cir. 1999) (holding that an ALJ is in a better position to decide credibility).

If plaintiff's testimony concerning the intensity, persistence or functional limitations associated with her pain is not fully supported by clinical evidence, the ALJ must consider additional factors in order to assess that testimony, including: 1) daily activities; 2) location, duration, frequency and intensity of any symptoms; 3) precipitating and aggravating factors; 4) type, dosage, effectiveness and side effects of any medications taken; 5) other treatment received; and 6) other measures taken to relieve symptoms. 20 C.F.R. §§ 404.1529(c)(3)(i)-(vi), 416.929(c)(3)(i)-(vi). The issue is not whether the clinical and objective findings are consistent with an inability to perform all substantial activity, but whether plaintiff's statements about the intensity, persistence, or functionally limiting effects of her neck and back pain are consistent

with the objective medical and other evidence.  *See* SSR 96-7p, 1996 WL 374186, at *2 (SSA

1996).  A claimant's subjective symptoms must be supported by medical signs or conditions that

reasonably could be expected to produce the disability or alleged symptoms based on a

consideration of all the evidence.  *Pareja v. Barnhart*,  2004 WL 626176, at *10 (S.D.N.Y. 2004)

(concluding that despite plaintiff's subjective complaints, the ALJ noted that several physicians

determined that plaintiff could do medium work based on her medical records and on their own

evaluations of her test results).  One strong indication of credibility of an individual's statements

is their consistency, both internally and with other information in the case record.  SSR 96-7p,

1996 WL 274186, at *5 (SSA 1996).

   After considering plaintiff's subjective testimony, the objective medical evidence, and any

other factors deemed relevant, the ALJ may accept or reject claimant's subjective testimony.

*Martone v. Apfel*, 70 F. Supp.2d 145, 151 (N.D.N.Y. 1999); *see also* 20 C.F.R. §§ 404.1529(c)(4),

416.929(c)(4).  An ALJ rejecting subjective testimony must do so explicitly and with specificity

to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief and

whether his decision is supported by substantial evidence.  *Melchior v. Apfel*, 15 F.Supp.2d 215,

220 (N.D.N.Y. 1998) (quoting *Brandon v. Bowen*, 666 F.Supp 604, 608 (S.D.N.Y. 1987))

(citations omitted).

   Having reviewed the Administrative Transcript in its entirety, the Court finds that the ALJ

applied the correct legal standard in assessing plaintiff's credibility. The ALJ acknowledged that

he was "required to consider the claimant's prior work record, observations by treating

physicians, precipitating and aggravating factors of the symptoms, use of medication and other

methods for relief of symptoms, functional restrictions and daily activities." (T. 33).  The ALJ

specifically addressed plaintiff's credibility and determined:

> The claimant's allegations, as to the severity of her symptoms and limitations in relation to her ability to perform basic work activities, are found to be not well supported by the evidence of record or by her testimony as to her activities of daily living and thus, her testimony is not fully credible. (T. 35-36).

The ALJ discussed plaintiff's testimony regarding her daily activities and found that:

> The testimony is not a reliable guide in assessing her residual functional capacity. She was able to return to work with certain restrictions for eight months after the alleged onset of her disability. She is able to drive an automobile. She can attend to her personal needs. She attends school five days per week, with two days involving classes lasting three hours. The claimant's description of her functional ability is less than the assessments of all of the physicians who have examined her and contradicts the evidence of her ability to function. (T. 34).

In addition to the testimony cited by the ALJ, plaintiff provided additional testimony and facts that provide further support for the ALJ's rejection of her subjective complaints of pain. Plaintiff testified that she cleans her bathtub, shops in stores, drives a car and cooks. (T. 300-302). She testified that she is able to shower, wash her hair and dress herself. (T. 302). In plaintiff's application to the New York State Office of Temporary and Disability Assistance, she stated that she cleans, pays bills, shops for groceries, runs errands, picks up her boy from school everyday, irons and does laundry. (T. 75-76). Plaintiff stated that she prepares meals everyday and that she also cooks holiday meals. (T. 76). She commented that she needs help lifting a turkey or ham, but she is able to frost cupcakes and decorates cookies. (T. 76, 79). Plaintiff stated that she helps her son with his homework and plays games with him. (T. 76). She said that she feeds her fish, dog and cat (T. 76). She stated that she is able to dress herself, shampoo and style her hair, shave and feed herself. (T. 76). She stated that she goes out everyday and drives. (T. 78). She goes to Walmart once or twice a week and is able to shop but needs to lean on the cart. (T. 78, 80). She is very involved in her son's school functions and goes to plays and bakes for school parties. (T. 79). She stated that she goes to school

functions once a month and vacations once a year. (T. 79).  Plaintiff claimed that she visits and talks

on the phone with family and friends once or twice a week. (T. 80).

The ALJ also noted the inconsistent nature of plaintiff's complaints and statements. (T.

33).  The ALJ stated that plaintiff complained of pain upon moving her left arm, back pain when

she walked and difficulty standing for long periods of time. (T. 32).  However, the ALJ referred

to the Disability Report prepared by plaintiff wherein she reported that she:

> ". . . watched television and listened to the radio, and did craft work to pass the
> time and that her typical day consisted of taking her son and picking him up from
> the school bus, helping him with homework, picking up around the house, doing
> laundry, ironing, vacuuming, cooking, and doing the housework.  She indicated
> that she was able to shop, manage her finances, and was independent in her self-
> care." (T. 32).

The ALJ properly assessed the remaining factors enumerated in 20 C.F.R. §§

404.1529(c)(3)(i)-(vi), 416.929(c)(3)(i)-(vi).  The ALJ discussed plaintiff's medications including

Celebrex, Vioxx, Bextra and the "pain patch".  (T. 31).  The ALJ also discussed other measures

taken to relieve her symptoms such as epidural injections and physical therapy. (T. 32).   The ALJ

noted plaintiff's conservative treatment for complaints of pain in her neck, back and shoulder and

plaintiff's overall improvement after surgery.  (T. 31).

Plaintiff alleges that the ALJ erred in failing to consider her work history and her financial

difficulties when assessing her credibility.  SSA regulations provide that the fact-finder "will

consider all of the evidence presented, including information about your prior work record." 20

C.F.R. § 416.929(c)(3).   While "[a] claimant with a good work record is entitled to substantial

credibility when claiming an inability to work ... [w]ork history [ ] is but one of many factors to

be utilized by the ALJ in determining credibility."  *Marine v. Barnhart*, 2003 WL 22434094, at

*4 (S.D.N.Y. 2003); *see also Schaal v. Apfel*, 134 F.3d 496, 502 (2d Cir. 1998).  Although a

plaintiff with a long work history is entitled to "substantial credibility", the Commissioner may discount a plaintiff's testimony to the extent that it is inconsistent with medical evidence, the lack of medical treatment, and her own activities during the relevant period. *Howe-Andrews v. Astrue*, 2007 WL 1839891, at *10 (E.D.N.Y. 2007).

In this case, taken as a whole, the record supports the ALJ's determination that plaintiff's claims were not fully credible. The medical reports and the fact that plaintiff was able to return to work for 8 months adequately support the ALJ's finding that plaintiff's statements of constant and disabling pain were not credible. Further, with regard to plaintiff's financial inability to pay for prescription medications, plaintiff's contentions are unsupported by the evidence. At the time of the hearing, plaintiff testified, upon examination by her own counsel, that she was taking Bextra and Ultracet. (T. 299). Plaintiff stated that "Bextra is the one that I'm using now - - Bextra. And I take Ultracet for the pain." (T. 299). Nowhere in the transcript of plaintiff's testimony did plaintiff state that she only takes Motrin and Advil for her pain. Therefore, plaintiff's claim that the ALJ "failed to consider her reasons why she was not taking prescription medications" is baseless.

The Court finds that the ALJ employed the proper legal standards in assessing the credibility of plaintiff's complaints of consistent and disabling pain. The ALJ adequately specified the reasons for discrediting plaintiff's statements. Accordingly, the ALJ's analysis of the record and decision as to plaintiff's credibility was based on substantial evidence.

**C.      Residual Functional Capacity**

Residual functional capacity is:

"what an individual can still do despite his or her limitations . . . .  Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an

> ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule."

*Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96-8p, Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims ("SSR 96-8p"), 1996 WL 374184, at *2 (S.S.A. July 2, 1996)).  In making a residual functional capacity determination, the ALJ must consider a claimant's physical abilities, mental abilities, symptomology, including pain and other limitations which could interfere with work activities on a regular and continuing basis.  20 C.F.R. § 404.1545(a).

Pursuant to 20 C.F.R. § 404.1527(1), every medical opinion, regardless of its source, must be evaluated.  In determining how much weight to grant a medical opinion several factors are considered including:  (i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion, i.e. '[t]he more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight' that opinion is given; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; if it is, it will be accorded greater weight; and (v) other relevant but unspecified factors.  *Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir. 1993) (citing 20 C.F.R. § 404.1527(d)(1)(d)(6); 20 C.F.R. § 416.927(d)(2)).

In the case at hand, the ALJ found that plaintiff has the residual functional capacity to perform a range of light level work.[23]  (T. 26).  Plaintiff argues that as the RFC determination is

---

[23]  "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit

flawed as the ALJ committed errors in evaluating Dr. Schaeffer's opinions and plaintiff's credibility. (Dkt. No. 8, p. 19). As previously discussed, the ALJ afforded the proper weight to Dr. Schaeffer's opinion and to the remaining medical evidence. Further, as discussed, the determination that plaintiff was not fully credible is supported by substantial evidence. Thus, the plaintiff's argument is without merit.

**D.    Vocational Expert**

The ALJ concluded that plaintiff had the residual functional capacity to perform a range of light level work. (T. 36). The ALJ enlisted the services of a vocational expert to determine whether there were jobs plaintiff could perform despite her limitations. Plaintiff raises four arguments with regard to the vocational expert's testimony. First, plaintiff contends that the hypothetical question proposed to the vocational expert was based upon an RFC determination that was "inaccurate". Second, plaintiff argues that if the expert's testimony is rejected by the Court, the ALJ may not rely upon the medical-vocational guidelines ("Grids") as plaintiff suffers from significant non-exertional limitations. (Dkt. No. 8, p. 20). Third, plaintiff claims that the vocational expert's qualifications were not noted on the record and not stipulated to by plaintiff's counsel. Finally, plaintiff claims that the ALJ deprived her of a full and fair hearing by interrupting the vocational expert and testifying for the witness. (Dkt. No. 8, pp. 19-22). The Commissioner contends that there is no basis upon which to reject the testimony of the vocational expert.[24] (Dkt. No. 11, p. 18).

---

for long periods of time." 20 C.F.R. § 404.1567(b).

[24] Defendant concedes that the ALJ recognized that "he could not use the medical-vocational guidelines to direct [sic] finding as to whether plaintiff was disabled". (Dkt. No. 11, p. 17).

A "vocational expert's testimony is only useful if it addresses whether the particular claimant, with [her] limitations and capabilities, can realistically perform a particular job." *Aubeuf v. Schweiker*, 649 F.2d 107, 114 (2d Cir. 1981) (citing *Parker v. Harris*, 626 F.2d 225, 231, n.5 (2d Cir. 1980)).  Further, there must be "substantial evidence to support the assumption upon which the vocational expert based his opinion." *Dumas v. Schweiker*, 712 F.2d 1545, 1554 (2d Cir. 1983).

In this case, the ALJ asked the vocational expert whether there were any jobs existing in substantial numbers that a person with plaintiff's vocational and educational background, and with the following limitations could perform:

> lift and/or carry twenty pounds occasionally, ten pounds frequently.  Stand and/or walk for a total of six hours in an eight-hour workday.  Sit for a total of six hours in an eight-hour workday.  Push, pull limited to occasionally with both the upper and the lower extremities. Climb stairs and ramps occasionally. Ladders, ropes and scaffolds never.  Balance, stoop, kneel occasionally.   Crouch, crawl never. Reaching, not overhead, limited to occasionally.  Handling limited to occasionally. Fingering limited to occasionally.  (T. 305-306).

The vocational expert responded that a person with this set of assumptions could perform several jobs, including counter-clerk, tanning salon attendant and cleaner. (T. 35, 306).   Having reviewed the record, the Court finds that the hypothetical submitted to the vocational expert is supported by substantial evidence.  In this case, the ALJ presented the vocational expert with plaintiff's RFC which the ALJ determined "rests soundly upon the consensus of medical opinion in this case". (T. 33).   Specifically, the ALJ cited to the opinions of "Drs. Schaeffer, Cally, Fatti, Bogosian and Ginesh [sic]". (T. 33).  As previously discussed, the RFC is based upon substantial evidence.  Thus, the Court concludes that the hypothetical posed to the vocational expert is supported by the record.

Plaintiff now objects to the conduct of the ALJ during this portion of the hearing and further argues that the vocational expert was not qualified to render an opinion. (Dkt. No. 8, p. 20).   The vocational expert, Margaret A. Preno, presented testimony during the hearing without objection by plaintiff's counsel. (T. 304-311); *see Jordan v. Apfel*, 192 F.Supp.2d 8, 11 (W.D.N.Y. 2001) (concluding that plaintiff's objection without merit as he did not voice an objection during hearing with respect to conduct now claimed as improper or erroneous). Moreover, plaintiff's counsel posed questions to the expert and solicited her opinion regarding whether an individual with plaintiff's history could perform work in the national or regional economy.  (T. 309).  Plaintiff's counsel did not challenge the basis for the vocational expert's testimony and failed to raise any objection to the conduct of the ALJ until now.  Accordingly, the objections are forfeited.  *Barrett v. Barnhart*,  355 F.3d 1065, 1067 (7th Cir. 2004)**;** *Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002) (holding that absent an objection, the ALJ is entitled to rely on the vocational expert); *Union Tank Car Co., Inc. v. Occupational Safety & Health Admin.*, 192 F.3d 701, 707 (7th Cir. 1999) (holding that the failure to present an argument to the ALJ constitutes waiver of the right to raise it on appeal).  Thus, the Court finds plaintiff's objection to be without merit.

Accordingly, the Court concludes that the ALJ applied the appropriate legal standards and properly relied upon the testimony of the vocational expert.

## VI.    CONCLUSION

Based upon the foregoing, it is hereby

**ORDERED** that the decision denying disability benefits be **AFFIRMED**; and it is further

**ORDERED** that defendant's motion for judgment on the pleadings is **GRANTED**; and it is further

**ORDERED** that plaintiff's complaint is **DISMISSED**; and it is further

**ORDERED** that pursuant to General Order # 32, the parties are advised that the referral to a Magistrate Judge as provided for under Local Rule 72.3 has been **RESCINDED**, as such, any appeal taken from this Order will be to the Court of Appeals for the Second Circuit, and it is further

**ORDERED** that the Clerk of Court enter judgment in this case.

**IT IS SO ORDERED.**

Dated: September 29, 2008
      Syracuse, New York

_____
Norman A. Mordue
Chief United States District Court Judge